**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>  **Plaintiff,**<br><br>  v.<br><br>**ANDREW T. FRANZONE,  and**<br><br>**FF FUND MANAGEMENT, LLC**<br><br>  **Defendants.** | **No. _____**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Andrew T. Franzone ("Franzone") and FF Fund Management, LLC ("FFM") (collectively, "Defendants"), alleges as follows:

### SUMMARY OF ALLEGATIONS

1.     From August 2014 through September 24, 2019 (the "Relevant Period"), Franzone, the sole owner and officer of FFM, an investment adviser, fraudulently raised and misappropriated tens of millions of dollars of investor funds from the sale of limited partnership interests in a private fund they managed known as FF Fund I, L.P. ("FF Fund" or "the Fund"). Defendants made material misstatements of fact and omitted to disclose material facts regarding the Fund's investment strategy, valuation, and performance; misappropriated FF Fund assets; failed to eliminate or disclose serious conflicts of interests; and falsely represented that the Fund would be audited annually.

2.     Defendants intentionally made materially false representations to limited partner investors and potential investors that their fundamental investment strategy in managing the Fund was to maintain a highly liquid portfolio with the objectives of capital appreciation, current income, and risk management.  Defendants represented to investors that they were primarily trading options and preferred stock for the Fund.  In reality, by the end of 2014, Defendants had begun to invest in predominately illiquid investments such as private start-ups, early-stage companies, and real estate ventures, some of which were started by Franzone's friends and associates.  Despite these material changes in the Fund's investment strategy, Defendants continued to promote the Fund as a primarily liquid investment, which it was not.

3.     Defendants made these misrepresentations in the Fund's private placement memorandum ("PPM") that they distributed from December 2014 until at least June 2018.  Throughout the Relevant Period, Franzone also directed investors and prospective investors to FF Fund's website, which was under his control, and which repeated the PPM's false description of the investment strategy.  Similarly, in emails, conversations, and other communications with investors and prospective investors throughout the Relevant Period, Franzone made numerous misleading statements about the performance of the Fund's investments, and his role in achieving the alleged positive returns.  While falsely marketing the Fund to investors during the Relevant Period, Franzone raised over $38 million from approximately 90 investors who wanted, and were led to believe they were entering, a highly liquid investment fund.  As of August 31, 2019, Defendants reported total assets under management of approximately $48 million.

4.     On September 24, 2019, FF Fund filed for bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code.  According to the Chief Restructuring Officer appointed in the bankruptcy, FF Fund entered bankruptcy holding no liquid securities other than four hedge

fund investments that were liquidated for a total of $175,000.  In contrast, the majority of FF

Fund's investments were (i) illiquid, non-tradeable, privately held shares in early stage or start-

up companies, (ii) minority interests in real estate partnerships, or (iii) unsecured promissory

notes with long-term maturities.

5.      During the Relevant Period, Franzone also misappropriated Fund assets and

possessed conflicts of interest that he did not eliminate or disclose.  First, Franzone caused

approximately $26.6 million in Fund investor monies to be deposited into a separate company,

F5 Business Investment Partners, LLC ("F5"), which he owned, and in which the Fund had no

ownership interest.  Second, Franzone diverted monies from Fund accounts for his personal use.

For example, in or about October 2015, Franzone misappropriated FF Fund's assets by

improperly using $565,000 of FF Fund's cash to purchase a private airplane hangar to store his

personal race car collection.  Third, Franzone had personal incentives to invest Fund assets in

certain private companies or otherwise encumber Fund assets.  Franzone obtained personal loans

from the founders of at least two of the illiquid private companies in which he caused FF Fund to

invest, and Franzone pledged FF Fund assets to secure other personal loans he arranged.

6.      Defendants also misrepresented that they would have the Fund audited by an

independent accounting firm within 90 days of the end of each fiscal year.  By failing to have the

Fund audited, Defendants further concealed their misconduct in shifting the Fund's strategy and

their misappropriation of Fund assets.  Defendants' failure to have the Fund audited eliminated a

check on them inflating the value of Fund assets in reports to investors and, in turn, taking fees to

which they were not entitled.

7.      Defendants' material misrepresentations and omissions, misappropriation of Fund

assets, and failure to eliminate or disclose conflicts of interest violated the anti-fraud provisions

of the federal securities laws and their fiduciary duties as investment advisers.  Alternatively, Franzone aided and abetted FFM's violations.  The Commission respectfully requests, among other things, that the Court permanently enjoin Defendants from further violating the federal securities laws as alleged in this Complaint and order Defendants to pay disgorgement plus pre-judgment interest, civil penalties, and direct other appropriate and necessary relief.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

9.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. §78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the offers and sales of securities and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the District.  FFM and the Fund were founded in the District, where Franzone resided at the time.  Franzone also maintains an address in the District for Andrew T. Franzone, LLC, of which he is the sole owner.  Franzone and FFM offered and sold limited partnership interests in the Fund to numerous investors who reside in the District, including to the Fund's largest investor, a family trust, which was formed under New York law and whose trustee resided in the District during the Relevant Period.  Defendants had personal contacts in this District in which they made material misrepresentations or omitted material information about their trading strategy and activity.  Defendants also had phone calls and electronic communications with investors in this District in which they made material misrepresentations or omitted material information about their trading strategy and activity.

10.     Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce and/or the mails, including the use of e-mail, the internet, and telephone in connection with the illegal transactions, acts, practices, and courses of business alleged in this Complaint.

## DEFENDANTS

11.     **Andrew T. Franzone**, age 44, is a natural person who currently does not acknowledge having a fixed residential address but who generally can be found in the Miami, Florida area.  During the Relevant Period, Franzone was an investment adviser to FF Fund and its wholly owned affiliates, which he used to make and manage investments.  An investment adviser owes a fiduciary duty to its clients, which includes a duty of care and a duty of loyalty. The duty of care requires the investment adviser to provide investment advice in the best interest of its client, based on the client's objectives.  The duty of loyalty requires an investment adviser to eliminate or make full and fair disclosure of all conflicts of interest that might incline an investment adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict.  Franzone received substantial compensation for his investment adviser services to FF Fund and its affiliates.  During the Relevant Period, Franzone was also the sole owner, principal, and employee of FF Fund Management, LLC.  According to a December 2014 PPM for FF Fund, Franzone as of that time had over seventeen years' experience in real estate, venture capital, and private equity, and also ran a New York state registered motor vehicle dealership and repair shop called "Andrew T. Franzone, LLC," which he used to support racing vintage automobiles with a focus on NASCAR stock cars.  Franzone also owned a race car venture known as "ATF & Gunslinger."

12.     **FF Fund Management, LLC** (formerly known as Farrell Franzone Investment Management, LLC) is a Delaware limited liability company with its principal place of business

in Miami, Florida.  FFM filed an initial Form ADV with the Commission on August 25, 2017 as

an exempt reporting adviser.  Form ADV provides certain basic disclosures about an investment

adviser.  Certain investment advisers, known as exempt reporting advisers, may claim exemption

from registration and some aspects of the reporting requirements that are generally applicable to

investment advisers if they act solely as an adviser to qualifying private funds and the investment

adviser has assets under management in the United States of less than $150 million.  FFM is the

sole and exclusive investment manager for FF Fund I, LP and its affiliates and subsidiaries.

FFM is the general partner of FF Fund.  During the Relevant Period, FFM was an investment

adviser to FF Fund and its wholly owned affiliates.  FFM is 100 percent owned by Franzone.

## OTHER RELEVANT ENTITIES

13.      **FF Fund I, LP** (formerly known as Farrell Franzone, LP) is a pooled investment

vehicle with its principal place of business in Miami, Florida.  A pooled investment vehicle is

one in which funds from multiple investors are pooled for purposes of making investments and

returns are distributed to those investors based on their respective capital contributions.  FF Fund

purports to be exempt from registration as an investment company under Section 3(c)(1) of the

Investment Company Act of 1940.  FF Fund has filed 11 notices of exempt offerings of

securities on Form D since November 5, 2010, most recently on December 19, 2018.  FF Fund

entered into voluntary Chapter 11 bankruptcy proceedings in the Bankruptcy Court for the

Southern District of Florida on September 24, 2019.  As of September 2019, FF Fund had over

100 limited partners.

14.      **F5 Business Investment Partners, LLC** ("F5") was an investment vehicle

through which Defendants misappropriated FF Fund assets during the Relevant Period.

Franzone formed F5 on April 22, 2014, under the name Farrell Franzone Investments, LLC, and

as a single-member Delaware limited liability company with its principal place of business in New York, New York.  Franzone changed the entity's name to F5 Business Investment Partners, LLC on March 15, 2016.  Franzone owned 100% of F5's membership interests from its inception.  Franzone was also the manager of F5.  Throughout the Relevant Period, Defendants transferred money from FF Fund investors into accounts controlled by F5.  Defendants, through F5, used approximately $26.6 million of FF Fund's capital to procure and hold many of the illiquid investments described in this Complaint.  Franzone falsely told the outside administrator of FF Fund that F5 was wholly-owned by the Fund.  Defendants made no disclosure to FF Fund's limited partner investors that Franzone was F5's true owner.  It was not until November 12, 2019 that Franzone, pursuant to a request from the Chief Restructuring Officer for the Fund in the bankruptcy, transferred his membership interests in F5 to the Fund.  FF Fund had no membership interest in F5 until that time.  Following that transfer, the Chief Restructuring Officer obtained bankruptcy court authorization to file a voluntary Chapter 11 petition on behalf of F5.  The voluntary petition for F5 was filed on January 24, 2020 and the FF Fund and F5 bankruptcy cases are being jointly administered.  The diversion of Fund assets to F5 and Franzone was not authorized by FF Fund's organizational and governing documents, and far exceeded any fees and expenses to which FFM was entitled from the Fund.

15.     **F3 Real Estate Partners, LLC** ("F3") is a single-member Florida limited liability company with its principal place of business in Miami, Florida, and a subsidiary of FF Fund.  Franzone formed F3 on March 25, 2011, and used F3 to make real estate investments for FF Fund.

# FACTUAL ALLEGATIONS

## I.     Background

16.     In 2010, Franzone and a partner founded FFM's predecessor, Farrell Franzone Investment Management, LLC, ("Farrell Franzone").  Farrell Franzone was the entity that initially managed FF Fund.  Farrell Franzone marketed FF Fund as an investment vehicle that placed strong emphasis on risk management, capital preservation, and liquidity.  The Fund's core strategy was to take active, short-term proprietary trading positions and medium- and longer-term positions in exchange-listed preferred stock and stock options markets.  The Fund's secondary strategy was to invest a minority portion of its capital in non-exchange traded assets in an attempt to minimize the portfolio's overall volatility.  Farrell Franzone managed the Fund consistently with the stated investment strategy.

17.     Franzone's partner was a well-known day trader who had previously run a private preferred stock arbitrage fund.  Until at least mid-2014, the partner managed most of FF Fund's investment portfolio.  The partner was primarily responsible for trading preferred stocks, options, and other exchange-traded positions.  Franzone's primary role was to source and invest a smaller portion of FF Fund's capital in private company and real estate opportunities.  Franzone's partner withdrew all his capital from the Fund in the period July – October 2014, and was not involved in managing the Fund thereafter.  Franzone's partner did no trading on behalf of the Fund after July 2014.  Farrell Franzone had approximately $8 million in assets under management for FF Fund as of the end of July 2014.

18.     Following his partner's departure, Franzone was the sole owner and employee of Farrell Franzone.  Franzone sought to attract new investors to the Fund.  In December 2014, Franzone changed the name of the management company to "FF Fund Management, LLC."  Franzone also caused the Fund to issue a PPM dated December 31, 2014 (the "2014 PPM").

Defendants were responsible for, and had ultimate authority over, the statements contained in the 2014 PPM.  Notwithstanding the departure of Franzone's partner, Defendants set forth in the 2014 PPM a trading strategy and focus consistent with the Fund's prior PPMs.  However, beginning in August 2014, Defendants changed FF Fund's investment strategy away from the core strategy described in the PPM of investing in active, short-term proprietary trading positions and medium- and longer-term positions in exchange-listed preferred stock and options markets. Instead, rather than investing a minority portion of the Fund's capital in non-exchange traded assets as a hedge against volatility, Defendants concentrated the Fund in those types of investments.

### II.     Defendants Radically Changed the Portfolio from Mainly Liquid Securities to Illiquid Investments

19.     Starting in August 2014, Franzone began to steadily increase FF Fund's investments in start-ups, private companies, and real estate, while significantly decreasing the amount of preferred stock and options trading in the portfolio.  These illiquid holdings were the same asset classes for which Franzone had been principally responsible before his partner exited FFM's predecessor.  By the end of 2015, the books and records of the Fund reflect that private company investments and real estate comprised approximately 61 percent of FF Fund's portfolio, while securities held at brokerage firms represented only approximately 21 percent. The shift towards illiquid investments and away from exchange traded securities became even more pronounced in 2016 and thereafter.

20.     Franzone principally transferred Fund assets to F5, and then used F5 to make investments in untraded private companies.  Franzone retained an outside vendor to serve as the administrator for the Fund.  Among other things, the fund administrator calculated the net asset value of the Fund and prepared monthly account statements for limited partners based on

information provided by Franzone.  Franzone falsely told the administrator that the assets they

had acquired through F5 belonged to the Fund.  Franzone falsely represented to the administrator

that the Fund had a 99 percent ownership interest in F5.  Franzone also used F3 to make real

estate investments.

21.     Table 1 below is based on records obtained from the Fund's administrator and

shows the drastic change in the composition of FF Fund's investment portfolio as the result of

Franzone's overhaul of the investment strategy:

**TABLE 1**

| Year End | Private Company Investments | Real Estate Investments | Brokerage Firm Assets | Hedge Funds & Other Investments |
|---|---|---|---|---|
| Jan 2014 | 0% | 12% | 74% | 14% |
| 2014 | 24% | 18% | 33% | 25% |
| 2015 | 42% | 19% | 21% | 18% |
| 2016 | 66% | 16% | 12% | 6% |
| 2017 | 80% | 8% | 12% | 0% |
| 2018 | 82% | 10% | 6% | 2% |
| Sept 2019 | 93% | 1% | 1% | 5% |

22.     In addition to the fact that stock options and preferred stock constituted a far smaller portion of the investment portfolio, Defendant's trading activity in those asset classes also declined dramatically during the Relevant Period.  For example, reports generated by the Fund's administrator show that activity in the Fund's three trading subsidiaries had all but stopped by June 2015.  The Fund's main trading subsidiary reported no trades at all beginning in August 2014; a second trading subsidiary reported its last trade in May 2015; and the third subsidiary's investments consisted solely of cash and interests in the other two trading subsidiaries.

23.     All told, from 2014 through 2019, Franzone invested in almost four dozen private companies, including many start-ups in industries such as medical devices, social media apps, and waste recycling.  A common characteristic of these entities was that none of them were liquid investments and virtually all were extremely risky.  The following investments are illustrative:

a.  **Acadaca, LLC** ("Acadaca").  Based in New York City, Acadaca is a privately held company that offers website design and internet marketing services.  Acadaca's majority owner ("Individual 1") was Franzone's personal acquaintance.  Franzone agreed to extend credit to Acadaca in the aggregate amount of $6,750,000 through "Revolving Credit Promissory Notes" (the "Acadaca Notes") dated December 1, 2015 and May 21, 2017.  In order to provide this money to Acadaca, Franzone used FF Fund monies that he had caused to be deposited into accounts owned by F5.  In exchange, Acadaca pledged an aggregate of 10% of its membership interests, which were illiquid at the time and remain illiquid at present.  Acadaca subsequently

disputed its indebtedness to F5 but recently has acknowledged owing an amount that now exceeds the $6,750,000 it originally borrowed.

b.  **"FaveIt"** was a social media app being developed by Acadaca's majority owner, Individual 1.  In August 2013, Franzone, through F5, invested $318,000 in FaveIt in the form of a convertible promissory note.  Individual 1 abandoned FaveIt in 2016. FaveIt no longer exists.

c.  **Aldwych Capital Partners LLC** ("ACP").  Headquartered in New York City, ACP is described by Bloomberg as operating as an investment bank that focuses on private debt and equity financing and other "special situations."  ACP is privately held. Franzone caused F5 to invest $1,531,000 in ACP through F5's issuance of a promissory note in exchange for 15.5% of ACP's equity.  F5's equity stake in ACP is illiquid.  In the period April 15, 2016 – December 15, 2018, the accrued interest on the promissory note, which was to be paid "in kind" was less than $20,000.

d.  **Global Energy & Recycling, Inc.** ("GE&P").  GE&P's website described the company as "a privately owned and family operated New York-city based company" that was seeking to develop environmentally responsible waste management solutions.  On account of nonpayment of its lease, GE&P, since June 2018, has been locked out of a site that it was attempting to develop as a waste transfer station. Franzone, pursuant to a "Note and Warrant Purchase Agreement" (the "GE&P Agreement") dated April 29, 2015, caused F5, using FF Fund capital, to extend credit to GE&P in the amount of $3,271,500, of which GE&P actually received approximately $1,531,500, and has made an outstanding capital call for an additional $1,740,000.  The maturity date on the loan to GE&P is December 29, 2023.   F5 has

12

received no repayment of principal or interest under the GE&P Agreement.   Under

the GE&P Agreement, F5 did receive a warrant for GE&P equity.  By its terms,

however, the warrant was to expire on April 29, 2017.

e.  **Genesis Media, LLC** ("Genesis") was an advertisement technology company.  In

2014, Franzone on behalf of FF Fund, through F5, invested a total of $400,000 in

Genesis.  As of August 2017, Genesis's sole asset was a stake in its parent company.

The parent ceased operations in March 2018 when its senior lender sold all of its

assets in a foreclosure auction.  The company issued a tax form K-1 for the year

showing that the capital had been written down to zero.

f.  **Waves Technologies Limited** ("Waves") was a Guernsey corporation formed to

provide an air taxi service transporting customers among the Channel Islands.  On

October 24, 2017, Franzone on behalf of FF Fund, through F5, invested $254,890 in

Waves.  On September 14, 2018, Waves announced that it had shut down and was

liquidating.

24.     Defendants caused investors to receive monthly account statements that were

based on instructions and information which he provided to the Fund's administrator.  The

account statements gave no indication of the actual composition of the Fund's investment

portfolio, because, as represented in the PPM, Defendants' investment techniques supposedly

were "proprietary" and would be made available to agents, such as auditors and accountants,

instead.  Nor did these account statements reflect the fact that a substantial portion of the assets

in the Fund's portfolio actually was owned by Franzone through F5.  Investors merely received

one-page account statements that showed only the individual investor's beginning and current

account value, which was inflated because, among other things, the Fund did not own F5; additions and redemptions; and purported profit or loss.

### III.   Defendants Misrepresented FF Fund's Investment Strategy, Valuation and Performance

25.     Despite the fundamental change of investment strategy, Defendants consistently told investors and potential investors that FF Fund's investment strategy focused on equities, options, and preferred stock, and that the Fund was highly liquid and diversified.  Those representations were materially false and omitted material information.  Defendants' false representations and omissions induced approximately 90 new and existing investors to invest approximately $38 million in FF Fund during the Relevant Period.  Approximately $23.5 million of the new investment money came from the Fund's single-largest investor, a family trust managed by a trustee ("Individual 2") to whom Franzone personally made numerous oral material misrepresentations and omissions.

26.     Throughout the Relevant Period, Defendants offered and sold limited partnership interests in the Fund while claiming exemption from registration under Regulation D promulgated under the Securities Act, 17 C.F.R. §230.501.  Those limited partnership interests were securities within the meaning of the federal securities laws.

27.     Defendants solicited new investors for FF Fund using the 2014 PPM.  Franzone reviewed and approved drafts of the PPM and had ultimate authority over the PPM's content.  Franzone also approved the PPM's distribution.  The PPM's description of the investment strategy for the Fund was material to investors and potential investors.  Nonetheless, the PPM did not disclose Franzone's fundamentally new investment strategy for FF Fund, away from actively trading preferred stock and options and towards acquiring and holding illiquid, non-

traded private investments.  Defendants knew, or were reckless or negligent in not knowing, that the PPM's representations about his investment strategy were false and misleading.

28.     The 2014 PPM emphasized that FF Fund's investment focus was on stock options and preferred stock markets, and that it placed a strong emphasis on risk management, capital preservation, and liquidity.  The PPM set forth the strategy regarding the stock option and preferred stock market trading in detail in six pages that touted the asserted expertise and techniques that FFM would use to take advantage of perceived, short-term inefficiencies in those markets.  While the PPM included a statement that FFM could also have FF Fund invest in "Private/Non-Exchange Traded Investments," that discussion, which was less than one-half a page, stressed that FFM viewed such private investments as a "sister strategy" whose purpose was to minimize overall volatility and exposure to exchange traded market risks.  There was no disclosure of the radical change in the core investment strategy that had taken place since 2014.

29.     In addition to distribution of the PPM, Defendants also made other false representations to current and prospective investors to the effect that FF Fund remained highly liquid and engaged primarily in liquid trading strategies.  For example, throughout the Relevant Period, Defendants directed potential investors to FF Fund's website to learn more about the Fund.  Defendants approved and had ultimate authority over the content on the website.  The website's "Trading Philosophy" page contains a similar description of the investment strategy described in the PPM, and states that the Fund "places a strong emphasis on risk management, capital preservation, and liquidity."  Defendants knew, or were reckless or negligent in not knowing, that the website's representations about his investment strategy were false and misleading.

30.     The misrepresentations on the FF Fund website concerning Defendants'
investment strategy, to which Defendants directed investors and potential investors, were
material.

31.     Defendants also sent monthly account statements to investors via cover emails
that consistently highlighted the Fund's supposed "trading" returns.  For example, in a
September 2015 email to Individual 2, the trustee to the family trust that was FF Fund's largest
investor, Franzone wrote that the Fund is "track[ing] along nicely on the trading front . . . and we
just had fractional gains in the month . . . which was nice with all of the recent volatility in the
markets . . . ."  Each monthly email to Individual 2 thereafter through July 2016 contained
similar language about fictional trading gains, and often ended with an upbeat message, such as
the Fund was  "currently posting a gain with [x] trading days left to go in the month[.]"
Franzone's emails were materially false and misleading because the Fund was not generating
gains from trading securities.  As FFM's sole investment professional and the author of the cover
emails, Franzone knew, or was reckless or negligent in not knowing, that his emails were false
and misleading.

32.     The account statements themselves were materially false and misleading because:
(1) the valuations they showed were largely based on Fund assets that Franzone had diverted to
himself through F5; and (2) the Fund's main trading subsidiaries generated flat or negative
returns for the second half of 2014, and all of 2015 and 2016.  For example, the Fund's trading
subsidiaries did little to no trading from August 2014 through May 2015, and no trading from
June 2015 through September 2019, generating flat to negative returns.  Franzone knew that the
Fund's performance results were driven by his subjective valuation of the F5 investments, and
not trading in stock options and preferred stocks, because he was the only person investing on

16

behalf of the Fund, and he provided the information used to calculate returns to the Fund's administrator.  Defendants knew, or were reckless or negligent in not knowing, that the account statements and the transmittal emails accompanying them were false and misleading.

33.    Beginning in at least July 2016, Defendants also sent investors monthly computer-generated notifications that account statements were available to view on the FF Fund investor website.  These notifications told investors that they could log on to the "investor portal" on the Fund's website throughout the month to view "weekly mid-month return estimates on the [f]und's trading performance numbers."  However, the rates of return posted on the website were based primarily on private investment values that Franzone often marked at his discretion, rather than trading returns.  They were materially false and misleading because: (1) the valuations they showed were largely based on Fund assets that Franzone had diverted to himself through F5; and (2) the Fund's main trading subsidiaries generated flat or negative returns for the second half of 2014, and all of 2015 and 2016.   Defendants knew, or were reckless or negligent in not knowing, that the statements about rates of return that he caused to be posted on the website were false and misleading.

34.    Likewise, when soliciting potential investors throughout the Relevant Period, Defendants maintained the façade that Franzone was a trader.  In May 2017, for example, Franzone wrote to a potential investor ("Individual 3"), "[P]lease call me anytime that works for you.  I'm around all of the rest of this week and next – just trading on the screens throughout all of the days . . . ."  That email conveyed the impression that the active trading of liquid securities was Franzone's main activity on behalf of FF Fund.  At that time, however, assets available for trading accounted for only five percent of FF Fund's total portfolio.   Franzone made only one trade on the day he sent the email to Individual 3.

17

35.     Similarly, in an August 21, 2018 email to another prospective investor ("Individual 4"), Franzone compared FF Fund's returns to a benchmark index, and claimed that the Fund was invested "roughly 50% in income securities . . . 10% equity . . . 10% alternatives; 10% real estate; and 10% private investments."  But at that time, however, Defendants reported assets to the Fund's administrator showing that private investments actually accounted for 80% of FF Fund's holdings, most of which actually were held by F5.  Defendants knew, or were reckless or negligent in not knowing, that their emails to prospective investors were false and misleading.

36.     Franzone also made oral misrepresentations to investors about his supposed active trading on behalf of FF Fund.  For example, Franzone made misrepresentations to Individual 2 during golf outings and other social events, and when Franzone would visit at Individual 2's vacation home.  Franzone discussed his options trading strategy for FF Fund on virtually every such occasion, as well as the Fund's performance.  Individual 2 relied on Franzone's misstatements when he decided to make additional investments into FF Fund each year during the Relevant Period, for himself as well as for the family trust he managed.  Franzone also told another investor, Individual 5 that she could withdraw money from the Fund at any time, and that when the markets were down, his strategy would perform the best.  Similarly, Franzone told other investors that the Fund was engaged primarily in trading and that they would have the ability to withdraw their money at any time.  These statements were false because, as averred above, Franzone had already concentrated the Fund's investment portfolio in highly illiquid, non-traded investments beginning in August 2014.

37.     None of Franzone's many communications with current or prospective investors disclosed that he had completely overhauled FF Fund's investment strategy from primarily liquid

trading strategies to primarily illiquid private investments.  To the contrary, the emails accompanying the account statements gave the impression that trading alone was responsible for gains in the Fund.  Franzone's misrepresentations and omissions were material to the decisions of certain existing investors to invest additional funds with FF Fund during the Relevant Period. Those investors wanted what Franzone and FFM represented FF Fund's investment strategy to be – a proprietary strategy that sought capital appreciation and current income through sophisticated trading in liquid option and preferred stock markets.  Moreover, despite Defendants representing that the Fund was profitable, Defendants transferred substantial assets of the Fund to F5, an entity owned by Franzone, and wholly invested in illiquid private investments, thereby causing the Fund to suffer significant losses.

38.     The representations identified in Paragraphs 27 - 37 above were materially false and misleading.  At all material times, Defendants knew, or were reckless or negligent in not knowing, that those representations were false and misleading.  Franzone was the sole investment professional who made the decision to invest the Fund's assets in illiquid private and real estate investments.  Franzone also provided the outside Fund administrator with information about the Fund's holdings which showed the Fund was not the trading vehicle he represented to investors.  Franzone was the sole investment professional responsible for the misrepresentations and omissions made to investors about the investment strategy, valuation and performance of the Fund.

IV.     **Franzone Misappropriated FF Fund Assets**

39.     Throughout the Relevant Period, Defendants systematically caused FF Fund investor monies to be deposited into financial institution accounts owned by F5, an entity in which Franzone was the 100 percent owner and in which FF Fund had no equity interest during the Relevant Period.  According to the Chief Restructuring Officer in FF Fund's bankruptcy

case, the Defendants used at least $26.6 million of FF Fund's assets to invest in illiquid private companies held in F5.  Defendants even charged the Fund management and incentive fees on the very assets they had misappropriated through F5.  Defendants knew, or were reckless or negligent in not knowing, that FF Fund had no ownership interest in F5 during the Relevant Period.  Defendants knew because Franzone had organized F5's predecessor as his own company, because he had subsequently changed F5's name without changing its ownership, and because he managed both F5 and FF Fund.  Neither the 2014 PPM nor the Limited Partnership Agreement for FF Fund authorized Defendants to deposit investor monies into accounts owned by an entity in which the Fund had no ownership interest but that was instead owned by Franzone.  Defendants knew, or were reckless or negligent in not knowing, that they had no right to divert FF Fund investor monies to F5.

40.     For example, on October 5, 2015, Franzone provided $565,000 for the closing on the purchase of an airplane hangar to store his private race car collection and for his race team to use as a working garage.  Franzone's race car team and collection were his personal hobbies and/or personal business.  To complete the purchase transaction, Franzone partnered with Individual 5 and her husband ("Individual 6"), who were working with the race car team, and who were also FF Fund limited partner investors.  Franzone told Individual 5 and Individual 6 that he was buying the hangar with his personal funds.  In fact, FF Fund investor funds were the direct source of Franzone's purchase money for the hangar.  For example, one investor's ("Individual 7") $120,000 investment into FF Fund in October 2015 was immediately transferred to an account owned by F5, from which Franzone wired the $565,000 cash for the purchase of the hangar.  In 2019, Franzone admitted to Individuals 5 and 6 that he had used FF Fund money to pay for the hangar.

41.     Defendants also misappropriated FF Fund assets by other means.  For example, in late 2018, Franzone misappropriated $1 million in cash from FF Fund by causing the Fund to take out a high-interest loan, diverting the loan proceeds to his personal business interests, and then using FF Fund monies to repay the loan.  More specifically, Franzone executed on behalf of FF Fund a $1 million, short-term note that bore an annual interest rate in excess of 100%.  The lenders were the spouse ("Individual 8") of Franzone's attorney ("Individual 9") and a limited liability company controlled by one of FF Fund's outside consultants ("Individual 10").  Franzone pledged significant FF Fund assets, including stock, distributions from private investments, and condominiums to secure the loan.  The borrowers specifically listed on the note were FF Fund, a Fund subsidiary, and F5.  Franzone provided the lenders with wire instructions that listed the bank account name as FF Fund I, but the bank account number Franzone provided was an entity wholly owned by Franzone and through which he ran his race car team.  When one lender wrote a $95,000 installment of the loan via check, the check was made payable to FF Fund I.  Nonetheless, Franzone deposited the check and the rest of the loan installments in his race car team's account, thereby diverting all of the proceeds of the loan to his racing team.

42.     When Franzone could not pay the note at maturity, he agreed to transfer to the lenders a portion of the Fund's investment in a condominium project, which was near agreement on a sale and closed two months later.  Franzone eventually repaid the loan in May 2019 by paying the lenders $1.515 million from FF Fund's bank account.  Defendants did not disclose these transactions to the Fund's limited partner investors.  Neither the PPM nor the LPA authorized Franzone to engage in the transactions using Fund monies.  The $1 million that Franzone misappropriated exceeded any fees and expenses to which Defendants were entitled

under the PPM and LPA.  Defendants knew, or were reckless or negligent in not knowing, that Franzone was not authorized to use Fund monies for the transactions.

43.     Defendants also sent FF Fund assets to Franzone's former girlfriend ("Individual 11").  From August 2017 to May 2019, Franzone sent $289,000 via eleven separate wire transfers from an F5 account directly to the personal bank account of his former girlfriend, Individual 11.  Defendants transferred the cash for the transactions from an FF Fund account to the F5 account.  Franzone recorded F5 as a wholly-owned subsidiary of FF Fund in its books and records and, in turn, the transfers to Individual 11 in FF Fund's books and records as an investment in a company, which was engaged in the business of delivering luxury pet gift baskets and was owned by Individual 11.  In reality, however, there is no documentation whatsoever of any agreement relating to the purported investment in the company.  The payments to Individual 11 were nothing more than transfers of cash from Defendants to Franzone's former girlfriend with no discernible benefit to the Fund, nor any agreement to repay the moneys.  Defendants used FF Fund assets to make these payments.  Neither the PPM nor the LPA authorized Defendants to use Fund monies for this purpose.  Defendants knew, or were reckless or negligent in not knowing, that they were not authorized to do so.

44.     In June 2011, Franzone began to acquire on behalf of FF Fund, through F3, units in a residential condominium complex in Florida.  Defendants acquired more units in the same property over the years, eventually selling the units in May 2019.  However, instead of depositing all the proceeds into the FF Fund account, Defendants used at least $1.2 million of the proceeds of the sale to pay off a personal loan described in Paragraph 41 above.  Neither the PPM nor the LPA authorized Defendants to use Fund monies for this purpose.  At least $1.2 million that Defendants misappropriated also exceeded any fees or expenses to which

Defendants were entitled under the PPM and the LPA.  Defendants knew, or were reckless or negligent in not knowing, that they were not authorized to do so.

45.     The FF Fund monies that Defendants misappropriated greatly exceeded any reasonable calculation of fees to which they were entitled.  Under the Fund's Limited Partnership Agreement, FFM, as the General Partner, was entitled to receive an annual management fee of from 2% to 3% of the limited partners' capital account balances.  The Fund's 2014 PPM also provided that FFM was entitled to receive an annual performance fee of 20% of the profits shown in the limited partners' capital account balances.  During the Relevant Period, Defendants received or accrued over $3.7 million in management fees and approximately $3.3 million in performance fees.  Those fees were inflated because they were based on calculations that included investments held in F5 in which FF Fund investors had no actual equity interest at the time.  But even accepting the fees as legitimate, they were orders of magnitude less than the $26.6 million that Defendants misappropriated from FF Fund to procure investments held in F5, as well as other monies that Defendants misappropriated from FF Fund.

46.     The misappropriations described in Paragraphs 39-45 above were material to the Fund and to its limited partner investors.

**V.     Defendants Failed to Eliminate or Disclose Conflicts of Interest**

47.     As investment advisers, Defendants owed a fiduciary duty to act in the best interest of FF Fund and to eliminate or disclose actual or potential conflicts of interest. Defendants violated their fiduciary duty to the Fund by failing to eliminate or disclose Franzone's conflicts of interests related to his personal dealings with Acadaca's founder and majority owner, Individual 1.  Franzone had a conflict because he had a personal economic incentive to invest Fund assets in the illiquid securities of Acadaca.  Individual 1 had invested a total of $190,000 in FF Fund in 2012, 2013, and 2014.  In early 2014, Individual 1 approached

Franzone about his desire to invest additional money in FF Fund.  Franzone proposed that instead of investing in the Fund, Individual 1 should make a $150,000 personal loan directly to Franzone.  Individual 1 agreed.  Not only did Individual 1 loan the $150,000 to Franzone personally rather than contributing it to the Fund, he also redeemed part of his existing stake in FF Fund in order to fund the loan.  Defendants continued to cause FF Fund to make further investments in Individual 1's company without disclosing or eliminating Franzone's personal conflicts.

48.     As averred above, Individual 1's company, Acadaca, was a private company to which Defendants later extended a multi-million dollar line of credit using assets misappropriated by F5 from FF Fund.  More specifically:

a.  In December 2015, while Franzone still personally owed money to Individual 1, Defendants agreed to extend a $500,000 line of credit from F5 in exchange for equity in Acadaca;

b.  In January 2016, while Franzone still personally owed money to Individual 1, Defendants invested another $300,000 of FF Fund's assets in Acadaca; and

c.  In May 2017, while Franzone still personally owed money to Individual 1, Defendants extended an additional $6,250,000 line of credit from F5 to Acadaca in exchange for additional equity.

49.     Franzone did not eliminate the conflict at the time Defendants extended the loans to Acadaca, nor did he disclose to FF Fund investors the existence of the personal loan, the circumstances of it being funded, or the fact that the loan was still outstanding when he agreed to extend the line of credit.  At the time the Fund entered bankruptcy in September 2019, Acadaca owed a total of almost $6.9 million to F5.

24

50.     In addition, Defendants failed to act in the Fund's best interest when they caused FF Fund to liquidate an existing investment so that they could use the cash to pay off a debt owed by Acadaca.  In early 2018, Acadaca needed cash, but the Defendants were unable to provide it at the time.  Franzone introduced Individual 1 to the owner of a third-party investment fund ("Fund A"), who agreed to make a high-interest, short-term loan to Acadaca in the form of a $450,000 promissory note issued on March 12, 2018.  Defendants committed FF Fund to act as guarantor on the note.  Acadaca failed to repay the note by the time it matured on May 12, 2018, and also failed to repay the note after two subsequent extensions of the maturity date.  Defendants then caused FF Fund, which owned limited partnership interests in Fund A, to redeem its interests and use the proceeds to pay Fund A $524,120.  In exchange, Fund A assigned the note from Acadaca to FF Fund.  Acadaca had not repaid its obligation on the note to FF Fund by the time the Fund entered bankruptcy in September 2019.

51.     Franzone's dealings with Acadaca and Individual 1 constituted conflicts of interest for Defendants.  But Defendants did not eliminate those conflicts or disclose them on FF Fund's website or by any other medium of communication.

**VI.     Defendants Failed to Provide Investors with Yearly Audit Reports**

52.     During the Relevant Period, Franzone and FFM falsely represented to investors that they would be provided with audit reports for FF Fund.  Defendants made this false representation in FF Fund's 2014 PPM, which states that investors would be provided with audited financial statements annually, within 90 days of the end of the fiscal year.  The promise of a Fund audit was an important safeguard to the Fund and its investors because the auditor would have full access to the content of FF Fund's portfolio of investments.  Investors did not have direct access to that information because the investment techniques of FF Fund were deemed proprietary

53.     Despite these representations, Defendants did not timely provide investors with any audited financial statements for FF Fund after the fiscal year ending on December 31, 2014. Even that statement for 2014 was not completed until March 14, 2018.  Despite complaints from investors, no audits were completed for the years 2015-2018.  Franzone and FFM not only misrepresented that the Fund's financial statements would be audited, they denied investors the benefit of what was supposed to be an important check and safeguard.  As a result, investors could not see that F5 was not wholly owned by the Fund, that Franzone used Fund assets to pay for his race car team expenses, or that Defendants otherwise abused Fund assets.

**VII.    Defendants' Fraud is Revealed**

54.     Although Defendants made material misrepresentations throughout the Relevant Period, concealed their misappropriation of Fund assets, and failed to eliminate or disclose their conflicts of interest, certain investors eventually became suspicious and began to ferret out their misconduct.  In early 2019, Individual 5 overheard an in-person conversation that Franzone was having with an outside consultant ("Individual 12") he had hired to review the Fund's expenses. In addition to being investors in FF Fund, Individual 5 and her husband, Individual 6, a former NASCAR driver, knew Franzone because Individual 6 managed Franzone's race car team.  The couple both heard the consultant express concern to Franzone that FF Fund did not have proper documentation for Fund investments, and that there were many questionable disbursements to outside vendors for what appeared to be duplicative or unnecessary services.  Individual 5 and Individual 6 later confronted Franzone about what they had heard.  Franzone initially denied the existence of any problems, but during the course of a wide-ranging and sometimes heated discussion, ultimately told Individuals 5 and 6 that FF Fund's investment portfolio was totally illiquid.

55.     Individual 5 later contacted a registered investment adviser ("Individual 13") who had referred clients to FF Fund.  Individual 5 told Individual 13 what Franzone had said about FF Fund being illiquid.  Individual 13 thereupon demanded an in-person meeting with Franzone. During the ensuing meeting in April 2019, Franzone disclosed a number of previously undisclosed facts about his handling of FF Fund.  Most notably, Franzone repeated the substance of what he had said to Individuals 5 and 6 about FF Fund being totally illiquid.  Franzone specifically stated to Individual 13 that the Fund had less than $10,000 invested in the kinds of investments emphasized in the PPM – i.e., income generating securities, options, preferred stocks and other exchange-traded or liquid investments.  Franzone also stated that he had not done any trading in options and preferred stocks at all since early 2018.  Franzone also stated that he had allocated virtually all of FF Fund's capital to illiquid private investments.  Franzone further admitted that the value of FF Fund's invested capital was tens of millions of dollars less than Franzone had previously reported.  Individual 13 recognized some of the specific private companies Franzone identified during their discussions, and he confronted Franzone as to how investments in those entities could have supported the capital account valuations that Defendants had reported to limited partners in the Fund.  Franzone admitted that his markings of the value of investments in those private companies had been inflated.

56.     In approximately June 2019, the largest investor in FF Fund, the trust as to which Individual 2 served as trustee, requested to review the Fund's books and records.  Shortly after receiving that request, Defendants sent emails to all investors announcing that they were planning to liquidate the Fund.  FF Fund has not returned investors' capital investments.  Instead, on September 24, 2019, FF Fund filed a petition in the United States Bankruptcy Court for the Southern District of Florida under Chapter 11 of the Bankruptcy Code.

27

## FIRST CLAIM FOR RELIEF

### Fraud in Violation of Section 10b of the Exchange Act and Rule 10b-5 Thereunder

(Against Andrew T. Franzone and FF Fund Management, LLC)

57.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 56 of this Complaint as though fully set forth herein.

58.     Franzone and FFM, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, directly or indirectly (a) employed devices, schemes, or artifices to defraud, (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

59.     By reason of the foregoing, Franzone and FFM violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Fraud in Violation of Section 10b of the Exchange Act and Rules 10b-5(a), (b) and (c) Thereunder

(Against Andrew T. Franzone)

60.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 59 of this Complaint as though fully set forth herein.

61.     FFM directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, intentionally, knowingly or recklessly (a) employed devices, schemes, or artifices to defraud, (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

62.     Franzone knew, or was reckless in not knowing, that FFM engaged in those violations.  By engaging in the acts and conduct alleged in this Complaint, Franzone knowingly provided substantial assistance to FFM's violations of Section 10b of the Exchange Act, [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

63.     By reason of the foregoing, Franzone is liable for FFM's violations pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].  Unless restrained and enjoined, Franzone will continue to aid and abet violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

## THIRD CLAIM FOR RELIEF

### Fraud in Violation of Sections 17(a) of the Securities Act

(Against Andrew T. Franzone and FF Fund Management, LLC)

64.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 63 of this Complaint as though fully set forth herein.

65.     Franzone and FFM, in the offer or sale of securities, by the use of the means or instruments of communication in interstate commerce or by use of the mails, directly or indirectly:

(a) knowingly or recklessly employed any devices, schemes, or artifices to defraud;

(b) knowingly, recklessly or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and/or

(c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

66.     By reason of the foregoing, Franzone and FFM violated and, unless enjoined, is reasonably likely to continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud in Violation of Sections 17(a) of the Securities Act

(Against Andrew T. Franzone)

67.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 66 of this Complaint as though fully set forth herein.

68.     FFM, in the offer or sale of securities, by the use of the means or instruments of communication in interstate commerce or by use of the mails, directly or indirectly:

(a) knowingly or recklessly employed any devices, schemes, or artifices to defraud;

(b) knowingly, recklessly or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and/or

30

(c) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

69.     Franzone knew, or was reckless in not knowing, that FFM engaged in those violations.  By engaging in the acts and conduct alleged in this Complaint, Franzone knowingly or recklessly provided substantial assistance to and thereby aided and abetted Blue Earth's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a))] and, unless restrained and enjoined, will continue to aid and abet violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].  Accordingly, pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)], Franzone is liable for those violations.

## FIFTH CLAIM FOR RELIEF

### Fraud in Violation of Section 206(1) of the Adviser Act

(Against Andrew T. Franzone and FF Fund Management, LLC)

70.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 69 of this Complaint as though fully set forth herein.

71.     By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Franzone and FFM were acting as investment advisers to FF Fund within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because they were persons who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

72.     By engaging in the acts and conduct alleged in this Complaint, Franzone and FFM, directly or indirectly, singularly or in concert, by use of the mails or means and

31

instrumentalities of interstate commerce, while acting as investment advisers, employed devices, schemes, or artifices to defraud any client or prospective client, with scienter.

73.     As investment advisers, Franzone and FFM owed FF Fund a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure to them of all material facts, as well as the duty to act in FF Fund's best interests, and not act in Franzone and FFM's own interests to the detriment of FF Fund.

74.     Franzone and FFM breached their fiduciary duties to FF Fund and engaged in fraudulent conduct that violated Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1), by knowingly or recklessly misappropriating FF Fund's money and by failing to eliminate or disclose conflicts of interest or potential conflicts of interest.

75.     By reason of the foregoing, Franzone and FFM have violated, and unless enjoined will again violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

<strong><u>SIXTH CLAIM FOR RELIEF</u></strong>

<strong><u>Fraud in Violation of Section 206(2) of the Advisers Act</u></strong>

(Against Andrew T. Franzone and FF Fund Management, LLC)

76.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 75 of this Complaint as though fully set forth herein.

77.     By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Franzone and FFM were acting as investment advisers to FF Fund within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because they were persons who, for compensation, engaged in the business of advising others, either directly or

32

through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

78.     By engaging in the acts and conduct alleged in this Complaint, Franzone and FFM, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as investment advisers, engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client.

79.     As investment advisers, Franzone and FFM owed FF Fund a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure to them of all material facts, as well as the duty to act in FF Fund's best interests, and not act in Franzone and FFM's own interests to the detriment of FF Fund.

80.     Franzone and FFM breached their fiduciary duties to FF Fund and limited partners-investors and engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client that violated Section 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(2), by misappropriating FF Fund's assets and by failing to eliminate or disclose conflicts of interest or potential conflicts of interest.

81.     By reason of the foregoing, Franzone and FFM have violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## SEVENTH CLAIM FOR RELIEF

### Fraud in Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder

(Against Andrew T. Franzone and FF Management, LLC)

33

82.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 81 of this Complaint as though fully set forth herein.

83.     By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Franzone and FFM were acting as investment advisers to FF Fund within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because they were persons who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

84.     FF Fund was a pooled investment vehicle within the meaning of Rule 206(4)-8(b) of the Advisers Act, 17 C.F.R. § 275.206(4)-8(b). FF Fund was engaged in, held itself out as being engaged primarily, and proposed to engage itself primarily in the business of investing, reinvesting, and/or trading in securities, and thus was an investment company as defined in Section 3(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a-3(a), or would have been an investment company under that provision but for the exclusion provided from that definition under either Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act of 1940, 15 U.S.C. § 80a-3(c)(1) & (7).

85.     By engaging in the acts and conduct alleged in this Complaint, Franzone and FFM, while acting as investment advisers to FF Fund, which was a pooled investment vehicle, by use of the means and instrumentalities of interstate commerce and of the mails, (1) made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in the pooled investment vehicles; and (2) engaged in acts,

34

practices, and courses of business that were fraudulent, deceptive, and manipulative with respect to investors and prospective investors in pooled investment vehicles.

86.     By reason of the foregoing, Franzone and FFM have violated, and unless enjoined will again violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8(a) thereunder, 17 C.F.R. § 275.206(4)-8(a).

### EIGHTH CLAIM FOR RELIEF

### Aiding and Abetting Violations Section 206 of the Advisers Act and Rule 206(4)-(8) Thereunder

(Against Andrew T. Franzone)

87.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 86 of this Complaint as though fully set forth herein.

88.     By engaging in the acts and conduct alleged in this Complaint, FFM, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as investment advisers, engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client and investors and prospective investors in pooled investment vehicles in violation of Sections 206(1), (2) and (4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2) an (4), and Rule 206(4)-8(a) thereunder, 17 C.F.R. § 275.206(4)-8(a).

89.     By engaging in the acts and conduct alleged in this Complaint, Franzone knowingly provided substantial assistance to FFM's violations of Section 206 of the Advisers Act and Rule 206(4)-8(a) thereunder, and thereby is liable under that provision as an aider and abettor, pursuant to Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f).

90.     By reason of the foregoing, Franzone has violated, and unless enjoined will again violate, Section 206 of the Advisers Act and Rule 206(4)-8(a) thereunder, as an aider and abettor of Apollo's violations pursuant to Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendants each violated the Federal securities laws and rules promulgated thereunder as alleged against them in this Amended Complaint.

### II.

Permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from committing future violations (i) Section 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; (ii) Section 10(b) of the Exchange Act, [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5]; and (iii) Section 206(1), (2), and (4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), & (4), and Rule 206(4)-8(b) thereunder, 17 C.F.R. § 275.206(4)-8(b).

### III.

Permanently restraining and enjoining Defendant Andrew T. Franzone, his agents, servants, employees and attorneys and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise from aiding and abetting future violations (i) Section 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c),

77q(a)]; (ii) Section 10(b) of the Exchange Act, [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5]; and (iii) Section 206(1), (2), and (4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), & (4), and Rule 206(4)-8(b) thereunder, 17 C.F.R. § 275.206(4)-8(b).

## IV.

Permanently restraining and enjoining Defendant Andrew T. Franzone from directly or indirectly, including, but not limited to, through any entity owned or controlled by Franzone, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer, provided, however, that such Order shall not prevent him from purchasing or selling securities for his own personal account.

## V.

Ordering Defendants to disgorge all ill-gotten gains, with prejudgment interest, as a result of the conduct alleged in this Amended Complaint.

## VI.

Ordering Defendants to pay civil monetary penalties pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9]; and

## VII.

Granting such other and further relief this Court may deem just and proper

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated:  April 23, 2021                    Respectfully submitted,

                                          SECURITIES AND
                                          EXCHANGE COMMISSION

                                          /s/ *Duane K Thompson*
                                          Duane K. Thompson*
                                          Marie K.N. DeBonis*
                                          HelenAnne Listerman

                                          *Application for admission *pro hac vice*
                                           *pending*

                                          U.S. Securities and Exchange Commission
                                          100 F Street, N.E.
                                          Washington, DC  20549
                                          Tel: (202) 551-7159 (Thompson)
                                          Tel: (202) 551-4516 (DeBonis)
                                          Tel:  (20) 551- 8156 (Listerman)
                                          Thompsond@sec.gov
                                          DeBonism@sec.gov
                                          Listermanh@sec.gov